**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**SHANNON M. WEAVER**                                                                                    **PLAINTIFF**

**VERSUS**                                                    **CIVIL ACTION NO. 1:06cv1234-LG-JMR**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY**                                              **DEFENDANT**

## REPORT AND RECOMMENDATION

This cause comes before this Court on Plaintiff's First Motion [8-1] to Remand as well as Plaintiff's First Motion [9-1] to Reverse. Both Motions are accompanied by a Memorandum [10-1] in Support. Defendant has filed a Response [11-1] in Opposition which is accompanied by a Memorandum [12-1] in Support. Plaintiff has also filed a Reply [14-1]. Having considered the Motions [8-1], [9-1], the Memorandum in Support [10-1], the Defendant's Response [11-1], the Plaintiff's Reply [14-1], the record of proceedings below, along with the record as a whole and the relevant law, this Court finds that Plaintiff's Motions [8-1] and [9-1] to Reverse/Remand should be denied.

## ADMINISTRATIVE PROCEEDINGS

On August 21, 2003, Plaintiff protectively applied for Supplemental Security Income benefits pursuant to Titles XVI of the Social Security Act. (Tr. 481-483). On September 12, 2003, Plaintiff applied for Disability Insurance benefits pursuant to Title II of the Social Security Act. (Tr. 102-104). In her applications, Plaintiff claimed she had been unable to work since December 20, 2002, due to injuries to both her left arm and shoulder. (Tr. 157-158). Plaintiff's claim was denied initially and on reconsideration. (Tr. 50-57, 60-63, 490-497, 499-502). Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 64-65). On May 19, 2005, Plaintiff had a hearing

before the ALJ. (Tr. 503). The ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 20-30). Plaintiff sought Appeals Council ("AC") review (Tr. 14-16), and the AC affirmed the ALJ's decision. (Tr. 9-11). This determination by the AC rendered the decision the "final decision" . On December 7, 2006, Plaintiff filed the instant Complaint [1-1], pursuant to 42 U.S.C. 405(g) of the Social Security Act, to obtain judicial review of a "final decision" of the Commissioner of Social Security.

## FACTS

Plaintiff, who is thirty-three (33) years old, has a high school education and attended two years of college before entering an electrician's apprenticeship program. (Tr. 21). The bulk of her past work has been in the construction trade except for a brief period in which she performed clerical work. Plaintiff injured her left shoulder on the job in 2000. (*Id*.) Plaintiff found that what should have been a relatively minor shoulder injury not only failed to heal, but continued to cause increasing pain and muscle weakness in her left upper extremity. *See* Plaintiff's Memorandum [10-1] p.1. Plaintiff began receiving treatment from Albert Pearsall IV, M.D. in September of 2000. (Tr. 282). On November 30, 2000, Dr. Pearsall performed a subacromial decompression on Plaintiff's left shoulder. Despite subsequent treatment and physical therapy, Plaintiff indicated that her condition did not improve. (*Id*.). Dr. Pearsall ordered Plaintiff to undergo a functional capacities evaluation ("FCE"), which took place on April 25, 2001.

The evaluation indicated that Plaintiff could infrequently lift, bilaterally, 15 pounds from the floor to her knee, 15 pounds from her knee to her waist, and 5 pounds from her waist to her shoulder. (Tr. 283). In his report, Dr. Pearsall noted that there were numerous inconsistencies during the evaluation. For example, Plaintiff was hypersensitive to touch and pinching by the examiner, but occasionally rubbed and palpitated her shoulder. (*Id*.). Plaintiff reported that she slept only 1.5 hours

per night, but Dr. Pearsall noted that Plaintiff was clear-eyed and appeared well rested. Dr. Pearsall further noted that although Plaintiff was wearing a sling that she claimed to have been using since May of 2000, the sling was solid white and unusually clean despite its alleged age. (*Id*.). According to Dr. Pearsall, Plaintiff scored 29 points above the maximum allowable score of 30 on the McGill pain questionnaire which indicates symptom magnification *Id*.). Dr. Pearsall assessed plaintiff with a 5% impairment of her left shoulder and 1% overall body disability (Tr. 283).

Dr. Pearsall referred Plaintiff to Mobile pain management specialist J. Patrick Couch on February 18, 2002. In his Initial History Detailed, Dr. Couch wrote about the underlying reasons for consultation. (Tr.418). Dr. Couch noted that Plaintiff reported a work related injury at the Mobile airport where she was working with a backhoe pouring concrete slabs. Apparently, Plaintiff's left shoulder was struck by the bucket of the backhoe. Dr. Couch noted that Plaintiff was not evaluated that day but did seek medical attention the next day from the company physician. Dr. Couch further noted that Plaintiff was referred to Dr. Wallace of the Orthopedic Group and underwent x-rays which were negative. (*Id*.).

Plaintiff informed Dr. Couch that she underwent stellgate ganglion blocks but that this did not improve her symptoms. (*Id*.). Plaintiff indicated that Ultram, nonsteroidal anti-inflammatories, and Oxycontin put her to sleep and caused her to feel nauseous. However, Plaintiff indicated that Neurontin and TENS Unit assuaged her discomfort (*Id*.). Dr. Couch noted that plaintiff reported an average pain level of 6/10 and that descriptors included; aching, shooting, stabbing, sharp, tender, burning, continuous, numb, miserable in the left shoulder. Plaintiff complained of numbness of the left arm with tingling in the fingers. (*Id*.). On examination, Dr. Couch found that the left hand was cool to touch when compared to the right and noticed slight blanching of the hand. (Tr. 419). He observed positive tenderness on palpation of the left deltoid and limited abduction to 80 degrees on

the left and that Plaintiff's grip strength in the left hand was 3/5, compared to 5/5 on the right. (*Id.*). Dr. Couch's impression ruled out sympathetically maintained pain syndrome in the left upper extremity and chronic left shoulder pain with decreased range of motion. Dr. Couch recommended a trial placement of a cervical spinal cord stimulator. (*Id.*). On March 21 and March 28, 2002, Dr. Couch performed two separate stellgate ganglion blocks on Plaintiff. Plaintiff reported satisfactory pain relief and was later discharged. (Tr. 413, 415). At a follow up appointment with Dr. Couch on July 15, 2002, Plaintiff described increased pain and swelling in her shoulder. Dr. Couch suggested that plaintiff undergo a trial cervical spine stimulator (Tr. 408).

On July 29, 2002, Plaintiff met with Edward Schnitzer, M.D. (Tr. 311). Plaintiff's left upper limb muscle strength was 4 to 4+/5 and she reported mild tenderness at the mid upper trapezius. Dr. Schnitzer noted that there was no focal atrophy in Plaintiff's upper limbs, and his impression was that Plaintiff suffered from persistent left shoulder pain. (Tr. 315). There was equivocal evidence for reflex sympathy dystrophy (no hair loss, erythema, contractures, or other physical examination signs that would confirm the diagnosis). Dr. Schnitzer suggested an MRI to rule out nerve damage in the area. (Tr. 315). Dr. Schnitzer noted that he was in agreement with the functional evaluation results of April 25, 2001, in which it was determined that the Plaintiff could work in the light duty category. *(Id.).*

Plaintiff next saw Dr. Couch on February 3, 2003, where she informed Dr. Couch that "I get sharp pain and numbness still in my arms and hands with shooting pain every now and then, with a steady squeezing in my left shoulder." Plaintiff also complained of occipital frontal headaches and "a lot of migraines lately." Plaintiff denied having headaches prior to her injury. (Tr. 404). A MRI of Plaintiff's cervical spine showed only a small central disc bulge at C6-7. (Tr. 398). At Plaintiff's next visit with Dr. Couch on August 5, 2003, she maintained her complaints of shoulder pain and

she inquired into preauthorization for a spinal cord stimulator. Dr. Couch's opinion was that a stimulator would be the next step in her medical care (Tr. 396).

On October 7, 2003, Plaintiff visited Dr. Couch's office for follow-up and evaluation. She stated, "The pain is killing me lately. It feels almost like I have pulled a muscle from my shoulder to my forearm. I have to force my arm straight." Plaintiff also said that she was doing pretty well with her current medications. On examination, he found that her grip strength in the left hand was down to 1/5 and noted minimal allodynia or hyperalgesia in the left arm (Tr. 392).

On October 11, 2003, Plaintiff was examined by Dr. Gregory Crenshaw. Plaintiff complained of reflex sympathetic dystrophy, left shoulder pain and neck pain. (Tr. 364). Dr. Crenshaw found no swelling, atrophy, or redness of Plaintiff's muscles and her grip strength was 5/5 in her right hand and 2 to 3/5 in her left. According to Dr, Crenshaw, Plaintiff demonstrated good fine and gross manipulation ability with no atrophy or deformity but she displayed reduced range of motion of her left shoulder and cervical spine (Tr. 365). Dr. Crenshaw's impression was severe left upper extremity difficulty with decreased range of motion but that Plaintiff had no problem sitting, standing, or walking. (Tr. 366). By October 21, 2003, Plaintiff had been on a trial of the cervical left spinal cord stimulator. She reported good results, with 50-60% improvement in her pain. Plaintiff wanted to proceed with a permanent stimulator system (Tr. 389). On October 22, 2003, Dr. Couch surgically placed the stimulator system in Plaintiff. (Tr. 382-384).At her October 28, 2003 follow-up appointment, Plaintiff reported "good efficacy" of the permanent spinal cord stimulator, stating, "It is like night and day." Dr. Couch noted that Plaintiff reported good stimulation into her left neck, shoulder and arm, and he expressed satisfaction that she was doing so well and scheduled her to return in six months. (Tr. 387).

Plaintiff did not see Dr. Couch again until February 16, 2004, where she reported good

stimulation of her left arm. Dr. Couch's assessment was complex regional pain syndrome of the left arm. (Tr. 455). During Plaintiff's next two visits with Dr. Couch, she indicated that her symptoms were reasonably well controlled with the cervical spinal cord stimulator. (Tr. 453-454). On May 4, 2004, Dr. Couch completed a questionnaire provided by Plaintiff's attorney. Dr. Couch indicated that Plaintiff's symptoms included complaints of persistent pain, impaired mobility of the affected area, autonomic instability, abnormal hair or nail growth, involuntary movement of the affected area, spread of pain to other extremities, muscle atrophy and contractures. Dr. Couch further opined that protracted walking/standing caused pain in Plaintiff's left arm and cervical area, headaches of sufficient severity to require Plaintiff to cease activity and recline, and pain in the axillary region.

Dr. Couch further found that sitting for protracted periods caused Plaintiff cervical pain as well as headaches. (Tr. 447). Dr. Couch restricted Plaintiff from lifting or carrying more than 20 pounds or 10 pounds while standing or walking up to two hours in an eight hour day. Dr. Couch further restricted Plaintiff from standing or walking for two hours in an eight hour workday. Dr. Couch felt that Plaintiff could not sit for six hours in an eight hour day nor could she alternate between standing and sitting for eight hours without reclining. (Tr. 448).

On July 6, 2004, Plaintiff reported to Dr. Couch that she was still having some breakthrough pain in her arm and hand but was overall much improved due to the spinal cord stimulator. Plaintiff's main complaints were insomnia, pain between the shoulder blades and some spasms in the upper back. On examination, Dr. Couch noted that the grip strength in her left hand was down to 4/5 (Tr. 449). In November, Plaintiff reported that she had fallen and fractured her right wrist and complained of persistent problems between her shoulder blades. Dr. Couch noted that hand grips were 4/5 bilaterally (Tr. 450).

Plaintiff returned to the clinic on December 29, 2004 and saw Dr. Couch's associate, Dr.

Xiulu Ruan. Plaintiff stated that she had recently undergone an MRI and that she had been experiencing burning pain in the left lateral three fingers. Plaintiff stated that her hands felt as though they were "on fire" when she tried to grab something and that this sensation was episodic, but most severe during the day. Plaintiff further stated that she felt as if the spinal cord stimulator had been pulled out of place following the MRI. Dr. Ruan said that he would submit a request for nerve conduction study of bilateral upper extremities to evaluate for evidence of entrapment neuropathy and he added Neurontin to Plaintiff's medication list (Tr. 449).

Plaintiff returned to Dr. Couch on May 23, 2005 and informed him that her left shoulder pain had worsened. Dr Couch noted that she had full range of motion of her left shoulder, but suffered some sensory deficits in her fingers. (Tr. 458). By July 27, 2005, Plaintiff was still having decreased stimulation in her left arm and hand, leading Dr. Couch to concluding that Plaintiff's stimulator required reprogramming. (Tr. 457). During her subsequent visit to Dr. Couch, Plaintiff maintained her complaints of pain, despite the stimulator operating at full voltage, however she estimated a 40% improvement in her condition. (Tr. 456). On September 30, 2005, Plaintiff was seen for a re-programming of her stimulator and Plaintiff reported increased stimulation of her hand and fingers following the reprogramming. (Tr. 460).

## STANDARD OF REVIEW

On review, the ALJ's determination that a claimant is not disabled will be upheld if the findings of fact upon which it is based are supported by substantial evidence on the record as a whole, and it was reached through the application of proper legal standards. 42 U.S.C. § 405(g); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The United States Supreme Court defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," being "more than a scintilla, but less than a preponderance." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971).

All evidentiary conflicts are resolved by the Commissioner, and if substantial evidence is found to support the decision, then the decision is conclusive and must be affirmed, even if there is evidence on the other side. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). On appeal, the court may not re-weigh the evidence, try the case *de novo*, nor substitute its own judgment for that of the Commissioner, *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988), even if it finds the evidence preponderates against the decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

## ANALYSIS

At the first step of the sequential evaluation, the ALJ found that Plaintiff had not engaged in any substantial gainful employment since her alleged onset date. (Tr. 24). The ALJ determined that the medical evidence established reflex sympathy dystrophy syndrome ("RSD") and migraine headaches as severe impairments. (Tr. 25). These impairments did not meet or equal any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 25). Before turning to the fourth step, the ALJ determined Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. § 404.1545 defines RFC as the type of work an individual can perform despite the limiting effects of his impairments. The ALJ found that Plaintiff retained the ability to perform light work. Pursuant to 20 C.F.R. § 404.1567(b), light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

The ALJ further limited Plaintiff to only occasional handling and fingering with her left hand and no reaching with her left arm. As the demands of Plaintiff's past work exceeded the scope of her RFC, the inquiry proceeded to the final step of the sequential evaluation. The ALJ, with the benefit of Vocational Expert (VE) testimony taken at the trial, found that Plaintiff could make the adjustment to other work existing in the national economy. Specifically, the ALJ found that Plaintiff could

perform work as a gate guard. (Tr. 28).

The Plaintiff argues that the ALJ rejected the findings of the treating physician without complying with 20 CFR 404.1512(e)(1).  The Plaintiff further argues that the ALJ's decision rejected the findings of the treating physician without first addressing the factors of 20 C.F.R. 404.1527(d)(2). *See* Plaintiff's Memorandum [10-1] p.7.  Specifically, the Plaintiff argues that Defendant's decision that she could perform light work is flawed because it relies upon the findings of Dr. Schnitzer.  First, Plaintiff avers that Dr. Schnitzer's opinion is immaterial because it relates to the period when Plaintiff was still able to work.  Second, Plaintiff argues that Dr. Schnitzer's findings were that Plaintiff could perform less than light work.  Third, Plaintiff maintains that pursuant to 20 CFR 404.1512(e)(1), treating physician opinions can be rejected only after contacting the physician in an attempt to resolve perceived discrepancies. *Id*.  Finally, Plaintiff argues that requested information, regarding the consultative examination, was not supplied to her by the Defendant.  *See* Plaintiff's Memorandum [10-1] pp.7-8.

An ALJ is required to review the medical evidence and give weight to the various medical opinions contained in the record.  Medical opinions are statements from an acceptable medical source about the nature and severity of an individual's impairments.  Defendant argues that a statement that an individual is disabled or cannot work is not a medical opinion, and an ALJ is not bound to accept such a statement, regardless of the source.  In fact, such matters are reserved for the Commissioner to decide. *See* 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1).

The Commissioner's regulations and rulings provide that the opinion of a treating physician is to be given controlling weight when it is an actual opinion from a treating source that is well supported by clinical findings and is consistent with the record as a whole.  *See* 20 C.F.R. §§ 404.1527, *Social Security Ruling* (SSR) 96-2p.  The Fifth Circuit has held that the opinions of a

treating physician should be afforded substantial weight, unless there exists good cause not to do so. Recognized good cause exceptions include opinions not supported by laboratory or clinical findings, brief conclusory statements, or opinions not otherwise supported by the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). However, even if given full weight, a physician's opinion is not controlling on the issue whether an individual is able to work. *Martinez v. Chater*, 64 F.3d 172, 176-176 (5th Cir. 1995).

Dr. Couch noted that Plaintiff's symptoms were complaints of prolonged pain, impaired mobility, autonomic instability, abnormal hair and nail growth, spasms, spread of pain to her other extremities, muscle atrophy, and contractures. Dr. Couch found that protracted walking or standing caused pain in Plaintiff's left arm and cervical area. Dr. Couch further found that Plaintiff suffered from headaches of sufficient severity to require her to cease activity and recline and that sitting for protracted periods caused Plaintiff cervical pain and headaches. (Tr. 447). As previously noted, Dr. Couch restricted Plaintiff from lifting or carrying more than 20 pounds or 10 pounds while standing or walking up to two hours in an eight hour day. Dr. Couch further found Plaintiff to be limited to standing or walking for no more than two hours in an eight hour workday. Dr. Couch opined that Plaintiff could not sit for six hours in an eight hour day nor could she alternate between standing and sitting for eight hours without reclining.

Defendant readily admits that in reviewing the medical evidence, the ALJ did not afford Dr. Couch's opinion controlling weight. *See* Defendant's Memorandum [12-1] p. 11. Defendant maintains that no error exists in his determination because Dr. Couch's opinion falls short of the requirements for controlling weight. *Id*. The Defendant first notes that many of the symptoms that Dr. Couch identified in the assessment are absent from his treatment notes. Although Defendant acknowledges that Plaintiff made persistent complaints of pain and impaired mobility of her left arm,

there is no mention in Dr. Couch's treatment notes of abnormal hair or nail growth, involuntary movement of the affected area, spread of pain to other extremities, or muscle atrophy.[1]

Defendant further points out that Dr. Couch's suggestion that Plaintiff's protracted walking or standing worsened her arm pain is without documentation in the record. The Defendant avers that Dr. Couch's notes fail to document a single instance of Plaintiff complaining of walking or standing exacerbating her pain. Furthermore, the ALJ noted that there was no indication that Dr. Couch and Plaintiff ever discussed standing or sitting affecting her condition. Dr. Couch assessed that Plaintiff's impairments caused headaches of sufficient severity to require her to cease activity and recline. Defendant argues that this pronouncement is at direct odds with Dr. Couch's treatment notes which reflect that Dr. Couch treated Plaintiff for migraine headaches and administered an occipital nerve block to address her migraine symptoms. According to Dr. Couch's treatment notes, the procedure occurred without incident and Plaintiff reported satisfactory pain relief. (Tr. 400). The Defendant argues, and the Court agrees, that Dr. Couch's opinion regarding these symptoms exist contrasts with the content of his treatment notes and that this discrepancy erodes at the probative value Dr. Couch's opinion.

Plaintiff recognizes that whether or not an ALJ affords a treating physician's opinion controlling weight is entirely within an ALJ's purview. *See* Plaintiff's Reply [14-1]. However, the Plaintiff argues that such a decision must be made in conformity with controlling regulations, specifically 20 CFR 404.1512(e)(1) and 20 C.F.R. 404.1527(d)(2).

---

[1]Defendant points out that Plaintiff maintains that Dr. Crotwell found atrophy in her left arm (Plaintiff's Brief at 16). However, Dr. Crotwell noted "very minimal' atrophy of Plaintiff's left arm. Furthermore, Dr. Crotwell made this finding on September 11, 2000. (Tr. 304-305). As Plaintiff was working at this time, his findings are less relevant to the current consideration. The Defendant further points out that Plaintiff applies the same logic to the probative worth of the consultative examination performed by Dr. Schnitzer. *See* Plaintiff's Memorandum [10-1] pp 11-12.

> 20 CFR 404.1512(e)(1) reads in pertinent part:
>
> (e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
>> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.
>
> 20 C.F.R. 404.1527(d)(2) reads in pertinent part:
>
>> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

Plaintiff argues that in the case at bar, the ALJ rejected the findings of the treating physician, Dr. Couch, without contacting him in an attempt to reconcile perceived discrepancies and instead relied on the findings of Dr. Schnitzer; who Plaintiff describes as a consulting, non treating, non-specialist, examiner. *See* Plaintiff's Memorandum [10-1] p. 11. Dr. Schnitzer rendered his opinion based upon an examination performed in July of 2002 and Plaintiff maintains that she was still working during the time and was not disabled. Plaintiff states that she continued to work for another five months until her RSD became so painful that she could not continue to work in December of 2002. *See* Plaintiff's Memorandum [10-1] p. 12. Plaintiff further argues that the Defendant attempts to validate

the opinion of Dr. Schnitzer by urging that Plaintiff's condition actually improved from July 29, 2002 until she retired on December 20, 2002. *Id.*

Also citing 20 C.F.R. § 404.1512(e)(1), the Defendant maintains that an ALJ is required to re-contact a medical source, but only when the evidence received from a treating physician is inadequate to determine whether an individual is disabled. The Defendant argues that the contemporaneous office notes from Dr. Couch were not ambiguous and provided the ALJ with sufficient information. The Defendant points out that it is important to note the difference between the rejection of an improper opinion, which does not trigger the duty to re-contact, and medical records which are not illuminative of a claimant's condition, which does trigger the duty. [2] *See* Defendant's Memorandum [12-1] p. 14. The Defendant avers that because the material reflecting the course of treatment from Dr. Couch was adequate for the ALJ to consider Plaintiff's impairments, there is no need to entertain Plaintiff's request to have this Court remand this matter for the receipt of more evidence.

In addressing the issue of a consultative examination, the Defendant points out that Plaintiff did undergo a consultative examination with Dr. Crenshaw. (Tr. 364-366). Defendant argues that Plaintiff's assertion that the ALJ "relied" on the findings of Dr. Schnitzer to formulate the RFC is erroneous. *See* Defendant's Memorandum p.14. The Defendant submits, and the Court agrees, that the ALJ's decision indicates that he factored in the findings of Drs. Pearsall, Schnitzer, Crenshaw, and the treatment notes from Dr. Couch. (Tr. 26-27). Thus, it cannot be said that the ALJ's RFC determination is without substantial evidentiary support. Furthermore, the Defendant submits that the ALJ properly recognized Dr. Couch's assessment to lack the support of clinical findings and that

---

[2] Plaintiff argues that a reading of 20 C.F.R. § 404.1512(e)(1) demonstrates that it applies to both opinions and testing.

this qualifies as good cause to give the assessment less weight.[3]

The Plaintiff argues that Defendant's Memorandum [12-1] fails to address the alleged failure of the Defendant to comply with 20 C.F.R. 404.1527(d)(2). Citing *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), the Plaintiff argues that absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. 404.1527(d), which requires consideration of:

> (1) whether the physician is a treating or examining physician;
> (2) the physician's length of treatment of the claimant;
> (3) the physician's frequency of examination;
> (4) the nature and extent of the treatment relationship;
> (5) the support of the physician's opinion afforded by the medical evidence of record;
> (6) the consistency of the opinion with the record as a whole;
> (7) the specialization of the physician; and
> (8) other factors.

Plaintiff argues that at best, the ALJ's decision addresses factors one and six and that his failure to comply with this regulation results in a finding that substantial evidence does not exist to reject the findings of the treating physician, Dr. Couch. *See* Plaintiff's Memorandum [10-1] p. 19. The Court is not persuaded by this argument. The ALJ is obligated to address the eight items listed above only in the absence of reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist.

In the case at bar, Dr. Couch's assessment is not consistent with other medical evidence. The state agency physician who reviewed the medical evidence determined that Plaintiff could lift up to 20 pounds occasionally, and 10 pounds frequently. That physician also determined that Plaintiff could

---

[3] However, that does not mean that Dr. Couch's submissions are devoid of any probative value. The Defendant points out, and the Court agrees, that the overall impression from Dr. Couch's treatment notes, as well as the findings from the other physicians, provide ample support for the RFC finding.

sit/stand/walk for six hours out of an eight hour workday (Tr. 371).  When seen by Dr. Schnitzer, Plaintiff demonstrated 4 to 4+/5 left upper limb muscle strength, with no focal atrophy in her upper limbs. (Tr. 314).  Dr. Crenshaw's examination of Plaintiff found no swelling, atrophy, or redness of her muscles.  Plaintiff's grip strength was 5/5 in her right hand and 2 to 3/5 in her left.  Plaintiff demonstrated good fine and gross manipulation ability with no atrophy or deformity.  However, Plaintiff displayed reduced range of motion of her left shoulder and cervical spine (Tr. 365).  Dr. Crenshaw's impression was severe left upper extremity difficulty with decreased range of motion and that Plaintiff had no problem sitting, standing, or walking (Tr. 366).

As these findings diverge significantly from those of Dr. Couch's opinion, and his treatment notes in some instances, his opinions are not consistent with the medical evidence as a whole and good cause existed to not afford Dr. Couch's opinion controlling weight.  Thus, the ALJ's obligation to perform a  detailed analysis of Dr. Couch's views, under the criteria set forth in 20 C.F.R. 404.1527(d), was not triggered because reliable medical evidence from treating or examining physicians, which controvert the evidence of Dr. Couch, is reflected in the record.

The Plaintiff further argues that the opinion of Dr. Schnitzer is not material evidence, and even were it material, Plaintiff requested of Defendant: (1) copies of the request to the consulting examiner, (2) identification of medical records submitted to the CE, and (3) copies of any other materials sent to the consulting examiner.  Plaintiff asked for these materials in her request for a review by the Appeals Council. (Tr. 15).  Plaintiff claims that none of these materials were provided to Plaintiff, thus precluding an opportunity to evaluate the opinions of Dr. Schnitzer.[4]  Plaintiff requests that Dr. Schnitzer's report be stricken from the record.  Plaintiff fails to cite any law as to why this Court should strike Dr. Schnitzer's report from the record nor does Plaintiff indicate what, if any, prejudice

---

[4]Defendant fails to address this issue in his Memorandum [12-1].

resulted from the alleged failure of the Defendant to provide Dr. Schnitzer's report. Regardless, Plaintiff did have access to the report while preparing her Memorandum [10-1] in Support, because she cites to Dr. Schniter's report on numerous occasions. The Court finds that this issue does not warrant remand nor does it find that the report should be stricken from the record. Finally, the Defendant argues, and the Court concurs, that the ALJ properly considered Plaintiff's credibility. *See* Defendant's Memorandum [10-1] p. 15.

## **CONCLUSION**

The court has fully reviewed the entire record on this matter and finds that the Commissioner did not err as a matter of law in reaching the "final decision" in this matter and that the decision is supported by substantial evidence. Accordingly, the Court recommends that the decision of the Commissioner is supported by substantial evidence and should be affirmed. Thus, the Court finds that Plaintiff's Motion [8-1] to Remand as well as Plaintiff's First Motion [9-1] to Reverse should be denied.

In accordance with the Rules of this Court, any party within ten days after being served a copy of this recommendation, may serve and file written objection to the recommendations, with a copy to the Judge, the U.S. Magistrate Judge and the opposing party. The District Judge at that time may accept, reject or modify in whole or in part, the recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions. Failure to timely file written objections to proposed findings, conclusions, and recommendations contained in this report will bar an aggrieved party, except on the grounds of plain error, from attacking on appeal- unobjected to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Services Automobile Association*, 79 F.3d 1425 (5th Cir. 1996).

THIS the __1st__ day of February, 2008.

                                                                s/ JOHN M. ROPER
                                        CHIEF UNITED STATES MAGISTRATE JUDGE